**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

--------------------------------------------------------------x

HIGHFIELDS CAPITAL I LP, HIGHFIELDS
CAPITAL II LP, AND HIGHFIELDS CAPITAL III
L.P.,

               Plaintiffs,

               v.

TEVA PHARMACEUTICAL INDUSTRIES LTD.;
EREZ VIGODMAN; EYAL DESHEH; ALLAN
OBERMAN; SIGURDUR OLAFSSON;
DEBORAH GRIFFIN; AND MAUREEN
CAVANAUGH,

               Defendants.

**Civil Action No:**

--------------------------------------------------------------x

**COMPLAINT AND JURY DEMAND**

This action is brought by Highfields Capital I LP, Highfields Capital II LP, and Highfields Capital III L.P., (collectively, "Plaintiffs") under the Securities Exchange Act of 1934 ("Exchange Act") and state common law against Teva Pharmaceutical Industries Limited ("Teva" or the "Company") and certain of its former officers (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered in connection with their purchases of Teva American Depositary Shares ("ADSs"), call options, swaps with Teva as the reference entity, as well as sales of put options on Teva ADSs (collectively, the common stock, swaps, call options and put options, "Teva Securities"), between February 10, 2014 and August 6, 2017, inclusive (the "Relevant Period"). Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters. Their information and belief are

based on, among other things, the investigation conducted by their counsel. Counsel's investigation included, among other things, a review of Teva's SEC filings, transcripts of Teva's public conference calls, press releases issued by Teva, a review of the Class Action complaint(s) filed in *Ontario Teachers' Pension Plan Board, et al v. Teva Pharmaceutical Industries Ltd. et al.* (hereinafter, the Amended Consolidated Complaint in that action shall be referred to as the "Class Action Complaint"); the complaint filed in *OZ ELS Master Fund, Ltd. et al v. Teva Pharmaceutical Industries Ltd. et al*, the complaint and opinions of the court *in In re Mylan N.V. Securities Litigation*; the complaint and opinions of the court in *Roofer's Pension Fund v. Papa, et al.*; the complaint and opinions of the court in *Speakes et al. v. Taro Pharmaceutical Industries Ltd., et al.*; and the complaint and opinions of the court in the related case to this action, *In re: Generic Pharmaceuticals Pricing Antitrust Litigation*.

## NATURE OF THE ACTION

1.     This action arises from two interconnected frauds at Teva – Teva's misrepresentations regarding its involvement in a massive and wide-ranging antitrust conspiracy to fix the price of certain generic drugs, and, relatedly, misrepresentations regarding what was actually driving Teva's financial success and the truth behind Teva's performance.

2.     Founded in 1901 and headquartered in Israel (with its U.S. Headquarters in North Wales, Pennsylvania), Teva develops, manufactures, markets, and distributes generic drugs. Over the past several years, the prices of these generic drugs have increased substantially, despite the fact that many of the drugs have been on the market for decades with relatively stagnant pricing.

3.     These significant price increases were the result of an illegal, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for numerous generic

2

drugs in the United States. Specifically, Teva and certain other (supposedly competitive) entities entered into contracts, conspiracies, and combinations, maintaining prices and reducing competition in the markets for a variety of generic drugs, that had the effect of unreasonably restraining trade. The scheme had its intended effect, boosting Teva's revenue and earnings throughout the Relevant Period.

4.      Throughout the Relevant Period, Defendants falsely attributed the Company's strong performance to legitimate business practices, including Teva's significant "improvement in the profit of the global generic business, driven by the performance of the US market," Teva's "global leadership in generics," as well as meeting cost-reduction goals and other "efficiency targets." Defendants also falsely "warned" investors that the Company's generics business was "subject to intense competition," and that it combats this competition through a "focused and competitive pricing strategy." As a result of these and other misrepresentations, Teva Securities traded at artificially inflated prices throughout the Relevant Period.

5.      While the anticompetitive behavior allowed price increases and contributed to Teva's bottom-line, Teva also misled investors about how important the price increases themselves were to Teva.   Defendants consistently attributed Teva's seemingly remarkable turnaround to fundamental business strategies, like cost cutting and good product management during the Relevant Period.   In reality, Teva's financial growth was the result of Defendants' implementation of a strategy to systematically raise generic drug prices across a large swath of Teva's generic drug portfolio (the "Price-Hike Strategy").   The strategy was initiated in early 2013, and rolled out with a first batch of price increases in July and August 2013.   At the same time, Teva was engaging in material and wide-ranging anticompetitive behavior (behavior that has now been detailed in multiple complaints) to fix drug prices (the "Antitrust Activity.").

3

6.      Teva's hidden Antitrust Activity would ultimately subject it to multiple lawsuits, regulatory scrutiny, and myriad business issues.   Perhaps most critically, Teva's Antitrust Activity, combined with its Price-Hike Strategy, utterly obfuscated the reality of the Company's financial condition and value to investors.

7.      All told, Teva imposed price increases scores of times during the Relevant Period. According to the Class Complaint, Teva's senior officers considered and approved each increase, and then carefully tracked the profits generated on a daily, weekly, and quarterly basis.   Over the Relevant Period, the financial impact of the strategy was staggering, totaling over $2.3 billion in profits attributable solely to the price increases.

8.      Defendants were highly effective at concealing that the Antitrust Activity and the Price-Hike Strategy were driving Teva's growth.   They invariably attributed the improved profits to legitimate (and non-collusive) sources.   Teva did not disclose to investors information concerning individual drug prices, changes in price, or revenues per drug, let alone profits.   Wall Street analysts, intimately familiar with Teva's business and disclosures, had no way to know if Teva was profiting from systematic price increases, except to ask Defendants.

9.      When analysts asked whether Teva's profits and performance were at all connected to price increases, the Officer Defendants answered with explicit denials.   And of course the Officer Defendants never revealed Teva's collusive activity to investors.

10.     The Defendants had to conceal that the Antitrust Activity and the Price-Hike Strategy were the main contributors to Teva's boost in profits.   The Price-Hike Strategy was inherently risky and unsustainable for a variety of reasons, including that two-thirds of the increases were done in tandem with other drug manufacturers.   And the Antitrust Activity was inherently illegal and would (and ultimately did) subject Teva to a host of lawsuits and

4

regulatory scrutiny.

11.     Wholesale purchasers of generic drugs routinely set pricing through competitive RFP bidding.  Thus, when Teva raised prices, any manufacturer in the generic drug market could underbid Teva and wipe out Teva's market share.  Additionally, the appearance of price gouging or collusion could draw public outrage, law enforcement scrutiny, and civil and criminal liability. These profits could vanish as quickly as they appeared.

12.     In mid-2015, generic drug pricing came under ever more intense focus from law enforcement, and Congress was calling for legislation to regulate pricing. Analysts grew concerned, but CFO Desheh deflected: "there's a lot of *noise around pricing* issues. Some of it's coming from politicians...*Our exposure to all these things is very minimal.*"

13.     As 2016 began, other pharmaceutical companies reported disappointing earnings, attributed to increased pressure to reduce prices.  This pricing pressure was a byproduct of heightened government scrutiny and public outcry.  When asked whether Teva faced the same risks, Olafsson falsely claimed that Teva was not exposed: "Teva has not seen any fundamental change or worsening in the pricing environment." Vigodman claimed "[w]hat we see is a 4% to 5% erosion [in pricing] … That's not something which is different from what we said during 2015." In reality, the denied pricing pressure was eating into Teva's profits.

14.     The truth concerning Defendants' fraudulent scheme began to be revealed on August 4, 2016, when Teva disclosed that its U.S. subsidiary—Teva Pharmaceuticals USA, Inc. ("Teva USA")—had received a subpoena from the Antitrust Division of the United States Department of Justice ("DOJ") relating to the marketing and pricing of certain of Teva's generic drugs and related communications with its competitors. The Company also disclosed on August 4, 2016 that on July 12, 2016, Teva USA had received a subpoena from the Connecticut

Attorney General ("Connecticut AG") relating to potential state antitrust law violations. These disclosures caused the prices of Teva Securities to decline.

15.     Further partial disclosures followed on at least November 3, 2016; November 15, 2016; December 6, 2016; December 13, 2016; December 15, 2016; January 6, 2017; February 7, 2017; and August 3, 2017.

16.     On November 3, 2016, media outlets reported that U.S. prosecutors were preparing to file criminal charges against Teva and several other pharmaceutical companies for unlawfully colluding to fix generic drug prices in violation of the federal antitrust laws. This disclosure caused the prices of Teva Securities to decline.

17.     On November 15, 2016, on a conference call with investors regarding Teva's recently filed 6-K and third quarter 2016 revenues, Olafsson admitted that the disappointing results were a result of pricing pressures, stating that, despite his past denials that Teva was exposed to or had observed pricing pressure, price erosion in generics had in fact contributed to Teva's reduced revenues.  This disclosure caused the prices of Teva Securities to decline.

18.     On December 5, 2016, Teva revealed that Olafsson, the Company's President and Chief Executive Officer of its generics segment, would "step down from his role" at the Company and formally retire at the end of the first quarter of 2017. This disclosure caused the prices of Teva Securities to decline.

19.     On or about December 13, 2016, the United States Department of Justice announced the anticipated criminal investigation of price fixing in the generic pharmaceuticals market. This disclosure caused the prices of Teva Securities to decline.

20.     On or about December 15, 2016, investors learned of the State Attorneys General complaint against numerous pharmaceutical companies, including Teva, for generic drug price

fixing. This disclosure caused the prices of Teva Securities to decline.

21.     On February 6, 2017, Teva disclosed that its President and Chief Executive Officer, Erez Vigodman, was terminated. This disclosure caused the prices of Teva Securities to decline.

22.     On or about August 3, 2017, Teva revealed disappointing revenues and profits, directly tied (by analysts and the company alike) to issues with generic drug pricing. This disclosure caused the prices of Teva Securities to decline.

23.     Under investigation and facing incredible regulatory scrutiny, Teva was forced to curtail or abandon its Antitrust Activity and its Price-Hike Strategy.

24.     Without the Price-Hike Strategy driving profits, Teva's ability to service its over $30 billion in debt also raised fears; the credit-rating agencies immediately downgraded the Company's debt to just above "junk."  And after 30 years of maintaining or increasing its dividend, the new Board and management of Teva were forced to cut the dividend by 75%.  In reality, without the Price-Hike Strategy, Teva was a fundamentally weaker company than investors were led to believe.

25.     **Facts Regarding the Antitrust Activity Pled Herein**.  Defendants colluded with other manufacturers to fix prices for a subset of drugs, which exhibited both parallel price increases with Teva's competitors and other indicia of collusion.  The Class Complaint and numerous other publicly filed documents substantiate these allegations.  These allegations are corroborated by the facts identified through the State Attorneys General ("State AGs") allegations that Teva engaged in a vast industry-wide price-fixing conspiracy.

26.     **Facts Regarding the Price Hike Strategy Pled Herein**.  Defendants carried out this securities fraud through a number of interrelated categories of misstatements and omissions.

7

First, Defendants explicitly attributed Teva's financial performance to legitimate and benign business strategies, including cost cutting and product selection. Having attributed the source of Teva's revenues, Defendants were required to disclose the reality that Teva's performance was driven by the undisclosed Price-Hike Strategy and Antitrust Activity. Second, under Item 5 of Form 20-F, Defendants were obligated to disclose that the Price-Hike Strategy and Antitrust Activity were impacting Teva's profits, both as they dramatically increased, and later as they evaporated. Third, Defendants repeatedly stated that Teva was excelling in a highly competitive environment. That was far from the truth, as Teva was only able to sustain its profits because of a lack of competition (the Antitrust Activity). Whether ultimately illegal or not, this was a precarious reality, which could be, and ultimately was, undercut.

27.     In each of Teva's SEC filings during the relevant period, Teva failed to disclose its Antitrust Activity or the Price Hike Strategy and repeatedly misled investors regarding the source of Teva's profits.

## JURISDICTION & VENUE

28.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, under Section 18 of the Exchange Act, 15 U.S.C. § 78r., and under state common law.

29.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a)

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. Defendant Teva, via its wholly owned subsidiary Teva USA, has its US

headquarters in this district.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.  The Multi-District Litigation concerning allegations of generic drug price fixing by Teva and others is proceeding in this District.

31.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## THE PARTIES

32.     Plaintiff Highfields Capital I LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.

33.     Plaintiff Highfields Capital II LP is a Delaware limited partnership with its main office location in Boston, Massachusetts.

34.     Plaintiff Highfields Capital III L.P. is a Cayman Islands exempted limited partnership with its main office location in Grand Cayman, Cayman Islands.

35.     Plaintiffs acquired and/or sold Teva Securities during the Relevant Period, including ADSs, call options, put options, and swaps with Teva as a reference entity, and were damaged upon the revelation of the alleged corrective disclosures.

36.     Each of the Plaintiffs is managed by, and acts via, a common manager, Highfields Capital Management LP, located in Boston, Massachusetts.

37.     Defendant Teva Pharmaceutical Industries Ltd., the world's largest generic drug manufacturer, is incorporated in Israel with its executive offices at 5 Basel Street, P.O. Box 3190, Petach Tikva, 4951033, Israel.  Teva has availed itself of the courts in this district as recently as

2016.

38.     Teva's wholly-owned subsidiary Teva USA has its principal offices in this district at 1090 Horsham Road, North Wales, Pennsylvania, 19454.

39.     Teva ADS trade on the NYSE under the symbol "TEVA."

40.     Teva has two reporting segments to its business, specialty medicines and generic medicines.  During the Relevant Period, Teva's generics segment contributed approximately one half of the Company's revenues.  Teva's U.S. generics business is the most important part of its generics segment comprising approximately 50% of overall generics revenues.

41.     Defendant Erez Vigodman served as Teva's President and CEO from February 11, 2014 to February 6, 2017 and as a Teva Director from June 22, 2009 to February 6, 2017. Vigodman signed and certified certain of Teva's alleged false and misleading reports on Forms 20-F and Forms 6-K filed with the SEC during the Relevant Period.  Vigodman also made false and misleading statements on numerous conference calls with investors and analysts.  During his tenure at Teva, Vigodman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

42.     Defendant Eyal Desheh ("Desheh") served as Teva's Chief Financial Officer ("CFO") from July 2008 to June 30, 2017, except from October 30, 2013 to February 11, 2014, a period during which he served as Teva's Interim CEO and Interim President.  Desheh signed and certified certain of Teva's false and misleading reports on Forms 20-F and 6-K filed with the SEC during the Relevant Period.   Desheh also made false and misleading statements on numerous conference calls with investors and analysts, as alleged specifically herein.

43.     Defendant Allan Oberman ("Oberman") served as President and CEO of Teva Americas Generics from November 5, 2012 to December 31, 2014.  Oberman made false and

10

misleading statements as alleged herein. During his tenure at Teva, Oberman possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading. On information and belief, Oberman maintained a domicile in this district during the Relevant Period.

44.     Defendant Sigurdur Olafsson ("Olafsson") served as President and CEO of Teva's Global Generic Medicines Group from July 1, 2014 to December 5, 2016. Olafsson made false and misleading statements on numerous conference calls with investors and analysts, as alleged herein. During his tenure at Teva, Olafsson possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

45.     Defendant Deborah Griffin ("Griffin") served as Teva's SVP and Chief Accounting Officer (Principal Accounting Officer), and served as the Authorized U.S. Representative of Teva, and the Authorized U.S. Representative of Teva Finance during the Relevant Period. She was also VP and CFO of Teva USA during the Relevant Period. While at Teva, Griffin possessed the power and authority, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting. On information and belief, Griffin resides in this district.

46.     Defendant Maureen Cavanaugh ("Cavanaugh") during the Relevant Period served as Teva USA's SVP and Chief Operating Officer, North America Generics. During her tenure at Teva, Cavanaugh possessed the power and authority to, and in fact did approve and control the contents of the Company's SEC filings alleged herein to be false and misleading, as they pertained to Teva USA's financial reporting. On information and belief, Cavanaugh resides in this district.

47.     Defendants Vigodman, Desheh, Oberman, Olafsson, Griffin, and Cavanaugh are referred to herein collectively as the "Officer Defendants" or the "Individual Defendants." Teva and the Officer Defendants are referred to herein collectively as "Defendants.

## BACKGROUND
### The Antitrust Activity

48.     Teva develops, manufactures, markets, and distributes generic medicines and a portfolio of specialty medicines worldwide.

49.     Teva is the largest generic drug manufacturer in the world and one of the 15 largest pharmaceutical companies worldwide.

50.     In 1984, the U.S. Congress enacted the Hatch-Waxman Act to expedite the entry of generic drugs to the market. These generic drugs were intended to serve as less expensive competitors to their name-brand equivalents, thereby reducing healthcare expenses in the U.S. This is a critical function given that generic drugs are the only form of direct price competition for identical, therapeutically-equivalent branded drugs. The Hatch-Waxman Act was a success and substantially advanced the rate of generic product launches in the U.S. Specifically, in 1983, before the Hatch-Waxman Act, only 35% of top-selling drugs had generic alternatives. By 1998, nearly all branded drugs had generic competitors. Generics are now dispensed 95% of the time when a generic form is available. As the U.S. Food and Drug Administration's Director of the Office of Generic Drugs stated to Congress in July 2006, "[t]he Hatch-Waxman Amendments have been very successful and have provided for the approval of over 8,000 generic drug products. These products are lower cost, high quality products that have saved the American public and the government billions of dollars."

51.     Although the Hatch-Waxman Act has successfully fostered generic competition and reduced prices, Teva and other pharmaceutical companies have frustrated the goals of the

Act by entering into anti-competitive arrangements that delay or impair generic competition. Teva manufactures several generic drugs whose prices have skyrocketed over the past several years. In fact, Teva increased the prices of its drugs so much—and in such synchronization with the prices of its competitors—that the only reasonable explanation is that Teva and its purported competitors entered into illegal arrangements to increase the prices of generic drugs. As stated by industry analyst Richard Evans at Sector & Sovereign Research in an April 21, 2015 report, the "plausible explanation is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products." Evans further stated that "[a]ll of the manufacturers," including Teva, "appear to be participating in the inflation." Stephen W. Schondelmeyer, a pharmaceutical economist at the University of Minnesota, echoed that sentiment and compared the generic market to the "[w]ild, Wild West of drug pricing," adding, "I believe in markets, but this market is broken; it's failing."

52.      As an example, the price of Doxycycline, a common antibiotic which Teva manufactures, rose a staggering 8,281% between October 2013 and April 2014. There appears to be no reasonable explanation for the increasing price of this drug.

53.      Data from the Centers for Medicare & Medicaid Services strongly suggests that manufacturers of the drug engaged in an improper scheme to fix the price of the drug. Indeed, around February 2013 the price of a 50mg dosage of Doxycycline increased from approximately $0.02 per pill to roughly $1.60 per pill, almost overnight.

54.      In addition, Teva and other drug manufacturers more than doubled their prices of the corticosteroid named Lidex during a single week in the summer of 2014—with certain product offerings increasing in price by more than 600%. The situation grew so alarming that several government entities took note of these extraordinary price increases and commenced

investigations. In July 2014, Connecticut Attorney General George Jepsen began an investigation into the industry and, on July 12, 2016, issued a subpoena to Teva relating to state antitrust law violations.

55.     The Antitrust Activity has led to an incredibly complex and wide ranging Multi-District Litigation, centered in this District and where Teva has been repeatedly named.  In an October 2018 opinion concerning one portion of the voluminous MDL claims, Judge Rufe summarized the allegations as "Defendants [which include Teva] engaged in anticompetitive conduct that was part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals."  Judge Rufe upheld the particular complaints being reviewed in that motion, finding that the Plaintiffs "have made sufficient allegations of evidence implying a traditional conspiracy to permit their Sherman Act claims to withstand dismissal."  And further, that "accepting all of the factual allegations as true, [the complaint] does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act."  Judge Rufe further wrote, "Ultimately, whether Group 1 Defendants' [including Teva] alleged pricing decisions were "simple, benign business decisions . . . or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings and which require discovery prior to resolution." . . . the Court finds that Group 1 Plaintiffs have pled plus factors which are sufficient to permit their Sherman Act claims to withstand dismissal."

56.     Numerous other complaints remain in the MDL, alleging hundreds of affected generic drugs across dozens of companies.  Teva is implicated in dozens, if not hundreds of these generic drug markets, and faces numerous complaints of antitrust activity, including the already upheld complaint.

14

57.     Similarly, antitrust related allegations against Teva's supposed-competitors (and actual co-conspirators) have been upheld in multiple cases. Teva's supposed-competitor Mylan, with whom Teva 'competes' with respect to such drugs as propranolol, diclofenac potassium, and enalapril maleate, is subject to a securities complaint alleging antitrust price-fixing conspiracy (which is past a motion to dismiss in part).

58.     Teva's supposed-competitor Taro Pharmaceuticauls, with whom Teva 'competes' with respect to such drugs as carbamazepine, enalapril maleate, fluocinonide, ketoconazole, is subject to a securities complaint alleging antitrust price-fixing conspiracy (which is past a motion to dismiss in part).

59.     In sum, and as alleged further below, Teva has concealed its participation in a generic drug price fixing conspiracy for years, misleading investors as to the source of Teva's profits, the sustainability (and legality) of Teva's business, and Teva's supposed success in a supposedly competitive environment; in realty, the environment was not competitive but instead collusive and Teva's revenues and profits were the result of collusive (and often illegal) activity.

### The Price-Hike Strategy

60.     Before the Relevant Period, Teva's generics segment was struggling and Teva's share price had dropped from the $60s in 2010 into the $30s by 2013. Then-CEO Levin acknowledged that the U.S. generics business had been "slowing fundamentally" for years and had announced a strategy to focus on Teva's other business segment, branded drugs. Abruptly, Levin was fired on October 30, 2013, after just 18 months as CEO, and was immediately replaced by CFO Defendant Desheh. As he stepped into the role of interim-CEO, Desheh was enthusiastic about Teva's prospects, as was Chairman Peter Frost, who told analysts that his friends were buying "hundreds of millions of dollars" of Teva shares.

61.    By the beginning of 2014, Desheh's optimism became more strident as he announced Teva's motivation to make a major acquisition, predicting that within 12 to 24 months Teva's "stock price will go up and we'll be able to use our share as a currency ... to fund transactions." As Defendant Vigodman took the helm as new CEO in February 2014, analysts reported that he also supported engaging in a significant acquisition.

62.    Defendants actively concealed, however, that by early 2013 Teva had adopted a non-public strategy to systematically increase prices across dozens of drugs in its generics drug portfolio (the "Price-Hike Strategy"). According to the Class Complaint, Teva's decisions to increase prices came from the top down. According to the Class Complaint, using an established review and approval procedure, price increases required the Chief Accounting Officer of Teva and Teva USA CFO, Griffin, and Teva USA COO, Cavanaugh to undertake and document a careful cost-benefit-analysis to determine whether to make a price increase; they would personally approve the increases. Further, according to the Class Complaint, Griffin and Cavanaugh would then decide when the increases would become effective, often implementing them in batches.

63.    Throughout the Relevant Period, Defendants told investors that Teva's increased profits came from ordinary business strategies, like cost cutting and new product launches. At every opportunity, in Teva's financial disclosures filed with the SEC and on conference calls, Defendants denied that Teva was engaged in price increases, let alone that those increases were driving profits

64.    They concealed this because the Price-Hike Strategy was inherently risky, unsustainable, and could subject Teva to government and law enforcement scrutiny, if not prosecution. Specifically, the strategy was unsustainable and risky because the U.S. generic drug

market was designed to be extremely competitive; generic drugs are effectively a commodity, fully interchangeable and identical in every respect, except for price. Wholesale customers solicit pricing though a "blind" RFP bidding process. Thus, even if Teva increased its prices, the profits could be short lived if other manufacturers undercut Teva's price to secure more market share. Moreover, generic drugs are an essential part of the lives of millions of Americans. Dramatic increases in prices would, and in fact did, garner public criticism and Congressional action that further undercut the sustainability of the strategy. Additionally, many of Teva's price increases occurred in tandem with competitors. Whether illegal or not, such pricing behavior is indicative of a lack of competition, if not collusion, and could, and again did, come under intense civil and criminal law enforcement investigations. Had Teva disclosed that its core business strategy was to aggressively increase prices on generic drugs, investors would have valued the Company very differently from one with a strategy driven by fundamental growth and cost cutting, as Defendants falsely proclaimed.

65.    Teva's Price-Hike Strategy was particularly well-suited for concealment. The generics industry is highly opaque; Teva, nor any of its peers, disclosed to the investing public any information concerning individual drug prices, changes or amounts of revenues per drug, let alone the profits from any particular drug. According to the Class Complaint, an econometric analysis of thousands of data points from various non-public, subscription-based data services, including multiple regression analyses, identified and quantified Teva's very large price increases that greatly exceeded general pricing trends and inflation. The Class Complaint analysis then isolated the amount of profit Teva generated solely as a result of the increases.

**Materially False and Misleading Statements Issued During the Relevant Period**

66.    In each of the Forms 20-F that Teva filed for the years 2013, 2014, and 2015, Defendants made substantively identical false and misleading statements (adopted by reference

in each quarterly filing) that (i) warned investors that "intense" competition was a primary risk Teva faced in the U.S. generic drug market, and that competition would force the price of generic drugs down, as would be expected; and (ii) described how Teva's competitive advantage was a "competitive pricing strategy" and the ability to launch new generics. These statements were false or misleading. In each of the Forms 20-F, neither the Antitrust Activity nor the Price Hike Strategy was disclosed.

67.    The Relevant Period begins on February 10, 2014, when Teva filed an Annual Report for the year ended December 31, 2013 on Form 20-F with the SEC (the "2013 20-F"). For the year, Teva reported revenues in its generic drug segment of $9.906 billion, including $4.181 billion in revenues from the U. S. market. The Company also reported annual "segment profitability" for its generics business of $1.656 billion.[1]

68.    In the 2013 20-F, Teva also discussed the competitive landscape in the U. S. market, which the Company described as intensely competitive. Specifically, the 2013 20-F states, in relevant part:

> Competitive Landscape. In the United States, *we are subject to intense competition in the generic drug market* from other domestic and foreign generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. *We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality and cost-effective production, our customer service and the breadth of our product line. We believe we have a focused and competitive pricing strategy.*[2]

---

[1] "Segment profitability" refers to the gross profit for the segment, less sales and marketing expenses and research and development expenses attributed to that segment.

[2] All emphasis is added unless otherwise noted.

69.     The Company also stated in the 2013 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

70.     The 2013 20-F disclosed a YOY decline in generic profit of $400 million, or 20%, "primarily" attributed to:

> "lower revenues and lower gross profit, which were partially offset by a reduction in selling and marketing expenses," and "by sales of higher profitability products in the United States."

71.     These statements were false and misleading because, while the Defendants attributed the sources offsetting the decline, they had a duty to disclose but concealed the full truth that the Price-Hike Strategy, whereby Teva made at least 18 systematic price hikes in July and August 2013, contributed materially to the results. According to the Class Complaint, these price increases generated as much as $250 million in Inflated Profit[3] in 2013 and, without that Inflated Profit, Teva would have reported a $650 million YOY decline in generic profit, or a 32% decrease, rather than the 20% decline reported by the 2013 20-F. The contribution of the Inflated Profit was significant, particularly in comparison to the attributed reduced S&M expenses, which declined only $26 million compared to 2012.

72.     The 2013 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Desheh and Altman, stating that the financial information contained in the 2013 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

---

[3] Inflated Profit, as used herein, shall have the same meaning as provided in the Class Complaint.

73.     The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market." Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

74.     On May 1, 2014, Teva held an investor earnings conference call ("May 1, 2014 Earnings Call"). On May 2, 2014, Teva filed its first quarter 2014 (the "Q1 2014") financial statements on Form 6-K with the SEC (the "Q1 2014 6-K").

75.     The Q1 2014 6-K disclosed a YOY increase in generic profit of $117 million, or 31%, which was purportedly "primarily" due to:

> "[H]igher revenues, higher gross profit and a reduction in selling and marketing expenses," with higher gross profit attributed to "the change in the composition of revenues in the United States and Europe, mainly products launched during the first quarter of 2014 and in the United States in the second half of 2013."

76.     During the May 1, 2014 Earnings Call, Desheh attributed the growth in U.S. generic revenues to "new product launches".

77.     Teva's generics division "experienced significant growth in the United States market, with 17% year-over-year growth, to a total of $1 billion with a number of new product launches."

78.     In the Q1 2014 6-K, Teva reported revenues in its generic drug segment of $2.398 billion, including $1.048 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $499 million.

79.     The statements were false and misleading because, having attributed the sources

of the increases, Defendants had a duty to disclose but concealed the full truth that the Price-

Hike Strategy, whereby Teva made at least 18 systematic price hikes implemented in July and

August 2013, contributed materially to the results.  The price increases generated as much as

$120 million in Inflated Profit in Q1 2014 that accounted for all of the increase in generic profit,

and nearly all of YOY growth in U.S. generic revenues.  The Inflated Profit amounted to nearly

three times the $42 million YOY reduction in S&M expenses. Teva also did not disclose that the

Antitrust Activity contributed to its profits.

80.     In the Q1 2014 6-K, Teva also touted its competitive position in the U.S. generics

market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **_United States Generic Medicine Revenues_**
>
> In the first quarter of 2014, we led the U. S. generic market in total prescriptions
> and new prescriptions, with total prescriptions of approximately 512 million,
> representing 15.0% of total U. S. generic prescriptions. We intend to continue our
> U.S. market leadership based on our ability to introduce new generic equivalents
> for brand-name products on a timely basis, with a focus on complex generics and
> other high-barrier products that we believe will create more value for patients and
> customers, our strong emphasis on customer service, the breadth of our product
> line, our commitment to quality and regulatory compliance and cost-effective
> production.

81.     The statements and omissions set forth above were materially false and

misleading because Teva and the Officer Defendants knew or should have known that the

Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of

generic drugs. It was false and misleading for Teva to attribute its strong financial results and

"U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name

products," its "strong emphasis on customer service," "the breadth of [its] product line," its

"commitment to quality and regulatory compliance" or "cost-effective production," when in fact,

those financial results were driven in material part by the undisclosed price-fixing scheme.

Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

82.     On July 31, 2014, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.515 billion, including $1.068 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $532 million.

83.     In the Q2 2014 6-K, Teva also touted its competitive position in the U. S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

### *United States Generic Medicine Revenues*

In the second quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 508 million, representing 14.7% of total U. S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

84.     The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme.

Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

85.     On October 30, 2014, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.432 billion, including $1.124 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $556 million.

86.     In the Q3 2014 6-K, Teva also touted its competitive position in the U. S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

### United States Generic Medicine Revenues

In the third quarter of 2014, we led the U.S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 504 million, representing 14.4% of total U. S. generic prescriptions. We intend to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and cost-effective production.

87.     The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme.

23

Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

88.     On February 9, 2015, Teva filed an Annual Report for the year ended December 31, 2014 on Form 20-F with the SEC (the "2014 20-F"). For the year, Teva reported revenues in its generic drug segment of $9.814 billion, including $4.418 billion in revenues from the U.S. market. The Company also reported annual segment profitability for its generics business of $2.148 billion

89.     In the 2014 20-F, Teva also discussed the competitive landscape in the U. S. market, which the Company described as intensely competitive. Specifically, the 2014 20-F states, in relevant part:

> In the United States, *we are subject to intense competition in the generic drug market* from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. *We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.*

90.     The Company also stated in the 2014 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

91.     The 2014 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2014 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

92.     The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market." Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

93.     On April 30, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 6- K"). For the quarter, Teva reported revenues in its generic drug segment of $2.621 billion, including $1.439 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $799 million.

94.     In the Q1 2015 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> ***United States Generic Medicines Revenues***
>
> In the first quarter of 2015, we continued to lead the U. S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 488 million, representing 13.7% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production.

95.     The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and

"U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

96.     On July 26, 2015, Teva entered into an agreement to purchase Allergan plc's global generic drugs business ("Actavis").

97.     On Teva's July 27, 2015 Conference Call  to discuss the Actavis acquisition, Olafsson responded to a question concerning the competitive landscape of the generic drug market, stating the U.S. generic market is very competitive … [T]here's fierce competition on most of the portfolio, if not all of the portfolio." This statement was false or misleading.

98.     On that same conference call, Vigodman added: "we promise to do everything in our power to basically take the company to be able to continue the improvement that we have been witnessing here. We believe in competition, and we'll do what is needed in order to win in all the markets we operate." This statement was false or misleading.

99.     On July 30, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.466 billion, including $1.326 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $729 million.

100.    In the Q2 2015 6-K, Teva also touted its competitive position in the U. S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

-

### *United States Generic Medicines Revenues*

In the second quarter of 2015, we continued to lead the U. S. generic market in total prescriptions and new prescriptions, with total prescriptions of approximately 483 million, representing 13.5% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

101.    The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

102.    On October 29, 2015, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.202 billion, including $1.032 billion in revenues from the U. S. market. The Company also reported quarterly segment profitability for its generics business of $578 million.

103.    In the Q3 2015 6-K, Teva also touted its competitive position in the U. S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

*United States Generic Medicines Revenues*

In the third quarter of 2015, we continued to lead the U.S. generic market in total prescriptions and new prescriptions, with approximately 481 million total prescriptions, representing 13.4% of total U. S. generic prescriptions. We seek to continue our U. S. market leadership by introducing new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, our broad product line, our commitment to quality and regulatory compliance and our cost-effective production.

104.    Also on October 29, 2015, Teva held a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, Defendant Olafsson touted the previously announced Actavis acquisition as "highly synergetic and accretive." Olafsson cautioned, however, that Teva could not begin the integration of the two companies prior to the acquisition closing because Teva was "competing with [Actavis] in the market on a day-to-day" basis.

105.    The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

106.    Desheh, on a November 19, 2015 conference call, falsely stressed that Teva was fiercely competing in generics markets:

Generic prices. There is – there are no – I don't believe that there are many examples for competitive environment, real competition, like we see in generic market in the United States ... So it is a highly competitive environment with players coming from all over the world with a very fierce price competition. The price of generic went down 50% over the past 10 years .... So we're playing a competitive game. We're playing it fairly. We of course play by the book and by the rule ... And we are in short playing in a very competitive market.

107.   The above statement in the Q3 2015 6-K was false or misleading.

108.   On November 30, 2015, Teva announced the commencement of concurrent offerings totaling approximately $6.75 billion, consisting of approximately $3.375 billion of its ADSs and approximately $3.375 billion of its Preferred Shares. Among other things, the purpose of these offerings was to fund, in part, the previously announced acquisition of Allergan plc's worldwide generic pharmaceuticals business, Actavis. Teva conducted the Offerings pursuant to a shelf registration statement and prospectus, filed with the SEC on Form F-3 on November 30, 2015 (the "Registration Statement"). The Registration Statement was supplemented through Preliminary Prospectus Supplements, filed with the SEC on Forms 424B5 on November 30, 2015, and Final Prospectus Supplements, filed with the SEC on Forms 424B5 on December 3, 2015 (the "Prospectus Supplements," and collectively with the Registration Statement, the "2015 Offering Materials").

109.   The 2015 Offering Materials incorporated by reference the 2014 20-F, the Q1 2015 6-K, the Q2 2015 6-K, and the Q3 2015 6-K. For all of the reasons stated above, Teva, Vigodman, and Desheh made materially false and misleading statements and omissions in the 2015 Offering Materials.

110.   On February 11, 2016, Teva filed an Annual Report for the year ended December 31, 2015 on Form 20-F with the SEC (the "2015 20-F"). For the year, Teva reported revenues in its generic drug segment of $9.546 billion, including $4.793 billion in revenues from the U.S.

market. The Company also reported annual segment profitability for its generics business of $2.682 billion.

111.    In the 2015 20-F, Teva also discussed the competitive landscape in the U. S. market, which the Company described as intensely competitive. Specifically, the 2013 20-F states, in relevant part:

> In the United States, *we are subject to intense competition in the generic drug market* from domestic and international generic drug manufacturers, brand-name pharmaceutical companies through lifecycle management initiatives, authorized generics, existing brand equivalents and manufacturers of therapeutically similar drugs. Price competition from additional generic versions of the same product typically results in margin pressures. *We believe that our primary competitive advantages are our ability to continually introduce new and complex generic equivalents for brand-name drug products on a timely basis, our quality, our customer service and the breadth of our product portfolio. We believe we have a focused and competitive pricing strategy.*

112.    The Company also stated in the 2015 20-F that the primary factors driving earnings and growth in its generics segment were "aging population, an increase in global spending on healthcare, [and] economic pressure on governments to provide less expensive healthcare solutions."

113.    In the 2015 20-F the Company also touted the prospects of its previously announced acquisition of Actavis and its impact on the Company's ability to market and distribute generic drugs at competitive prices. Specifically, Teva stated that "[u]pon consummation of our acquisition of Actavis Generics, the Actavis Generics portfolio and pipeline, combined with our strong existing generics portfolio, will further enhance our goals of delivering the highest quality generic medicines at competitive prices."

114.    The 2015 20-F contained signed certifications pursuant to SOX by Defendants Vigodman and Desheh, stating that the financial information contained in the 2015 20-F was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

115.    The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that: (1) the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs; and (2) as a result of the scheme, the Company was not "subject to intense competition in the generic drug market" or focused on "delivering the highest quality generic medicines at competitive prices." Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

116.    On May 9, 2016, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.170 billion, including $976 million in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $584 million.

117.    In the Q1 2016 6-K, Teva also touted its competitive position in the U.S. generics market, as well as its commitment to regulatory compliance. In particular, the Company stated:

> **United States Generic Medicines Revenues**
>
> In the first quarter of 2016, we continued to lead the U. S. generic market in total prescriptions and new prescriptions, with approximately 463 million total prescriptions, representing 12.7% of total U. S. generic prescriptions. We seek to continue our U. S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our pending acquisition of Actavis Generics.

118.    The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

119.    On August 4, 2016, Teva filed a report on Form 6-K with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 6-K"). For the quarter, Teva reported revenues in its generic drug segment of $2.294 billion, including $892 million in revenues from the U.S. market. The Company also reported quarterly segment profitability for its generics business of $614 million.

120.    In the Q2 2016 6-K, Teva stated, in part:

**United States Generic Medicine Revenues**

In the second quarter of 2016, we continued to lead the U. S. generic market in total prescriptions and new prescriptions, with approximately 446 million total prescriptions, representing 12.1% of total U.S. generic prescriptions. We seek to continue our U.S. market leadership based on our ability to introduce new generic equivalents for brand-name products on a timely basis, with a focus on complex generics and other high-barrier products that we believe will create more value for patients and customers, our strong emphasis on customer service, the breadth of our product line, our commitment to quality and regulatory compliance and our cost-effective production, including through our recent acquisition of Actavis Generics, which will substantially expand our generics operations and pipeline.

121.    The statements and omissions set forth above were materially false and misleading because Teva and the Officer Defendants knew or should have known that the Company was engaged in an undisclosed scheme to inflate and otherwise manipulate the price of generic drugs. It was false and misleading for Teva to attribute its strong financial results and "U.S. market leadership" to its "ability to introduce new generic equivalents for brand-name products," its "strong emphasis on customer service," "the breadth of [its] product line," its "commitment to quality and regulatory compliance" or "cost-effective production," when in fact, those financial results were driven in material part by the undisclosed price-fixing scheme. Similarly, Teva's generics segment revenues and profitability were also materially false and misleading because they were artificially inflated by the undisclosed price-fixing scheme.

122.    On September 7, 2016, Desheh participated in a Wells Fargo conference where he was asked by the Wells Fargo analyst, "Teva has said during this whole, the last couple years, that you're not really seeing the same generic erosion, pricing erosion that some of the other companies have mentioned or blamed.  Is that still the case?"  Desheh responded by claiming that Teva was not experiencing increased pricing pressure:

> Now, with talking about prices of the base business, product that we've been selling more than two years already, the prices are very stable there.... [Y]ou don't see -- there you don't see the erosion. Where we see erosion is ... [when] you have six months exclusivity, you start with the high price, and then obviously more competitors go into the market and the price goes down. But when we look at the base, there's no – there's no pressure on prices.

123.    On Teva's September 9, 2016 Generic Medicines Business Overview call with analysts, the slides presented echoed that Teva was not experiencing a change in pricing pressure: "Price erosion is nothing new[.]... Diverse portfolio and competitive cost structure allows for long-term value creation."

124.    The statements were false and misleading because, while Desheh claimed that

Teva's base business was experiencing "no pressure on prices," and the slides claimed that "price erosion is nothing new," Teva was suffering massive declines in profit and the inability to implement further hikes due to increased pricing pressure that was itself the materialization of the risks concealed by Defendants.

125.    During the September 9, 2016 call, Olafsson categorically denied Teva had increased prices on its generic drugs: "There is no inflation in the generic pricing, which I will talk about."

126.    Later during that same call, in response to a Bank of America analyst's question regarding the impact of specialty drug pricing on generics, Olafsson responded:

> [S]o first of all, we need to differentiate generics from branded pricing. And people that say that the generic – there's a big generic price inflation, are simply wrong.

127.    Olafsson even claimed that Teva had a *"secret sauce"* that immunized the Company from price fluctuations. These statements were false and misleading because each of these statements minimized (i) Teva's practice of making price increases pursuant to the Price-Hike Strategy, often by raising the price over 100% above the pre-inflation price, on 60 drugs or 22% of its portfolio; (ii) the importance of the Inflated Profit from those price increases to the Company, (iii) the unnatural price inflation in Teva's book of generic drugs caused by those increases and the attendant risks associated with such inflation; and (iv) that Teva was at the time experiencing a dramatic drop in Inflated Profit from those price increases and an inability to implement further increases as a result of the materialization of the risks concealed by Defendants. Teva also did not disclose the Antitrust Activity.

128.    During the September 9, 2016 call, Olafsson also responded to a question as to whether Teva would be taking price increases following the Actavis acquisition, stating:

So first of all, it doesn't work like we wake up when we are one Company, and

we can take price increases. Simply, it doesn't work like that in generics. When price increases are taken, there's some kind of abnormality in the business. There are shortages.

129.     The statements were false and misleading because they implied that because Teva only increased prices in limited circumstances, it was not exposed to price deflation.  The truth was that Teva had raised the prices of many drugs via numerous price increases frequently by more than 100% of the original price, and thus had enormous price inflation in its portfolio; none of the price increases related to shortages.

130.     On November 15, 2016, Teva filed its third quarter 2016 ("Q3 2016") financial statements on Form 6-K with the SEC (the "Q3 2016 6-K"), and held an investor earnings conference call (the "Nov. 15, 2016, Earnings Call").

131.     The Q3 2016 6-K disclosed a YOY increase in U.S. generic revenue of $261 million, or 25%, attributed to increased revenues from Actavis.  But, after removing Actavis' $538 million in U.S. generic revenues that quarter, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $277 million, or 27%.  In discussing the increased revenues that were due to Actavis, Teva disclosed that those revenues were:

> partially offset by loss of revenues following our divestment of certain products in connection with the acquisition, a decline in sales of budesonide … due to increased competition and the loss of exclusivity on esomeprazole.

132.     The statements were false and misleading because, having attributed the sources offsetting the increased revenues from Actavis, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $218 million in Q3 2015 to $97 million in Q3 2016, a decline of $121 million or 56%.  That YOY decline in Inflated Profit comprised as much as 44% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis.  It further concealed that the Price-Hike Strategy was

unsustainable, as the Inflated Profit was drastically declining, and Teva was increasingly unable to implement further hikes.

133.   During the November 15, 2016 Earnings Call, a Credit Suisse analyst asked, "[Y]ou mentioned that 7% erosion this quarter, but you said you're confident it will still remain in the mid single-digits going forward…. [W]hat's going to happen in the coming quarters [that] will be different than what you saw this quarter?" Olafsson responded:

> Let me start on the drug pricing, so overall, like previous quarters, there hasn't been any fundamental change in the US drug pricing. And what we saw in the difference between the 5% or mid single- digit we guided for going into it, versus exiting at 7%, was the impact of the pricing impact on the divested product.

134.   The statements were materially false and misleading because Teva was in fact experiencing a sustained and material decline in the pricing environment, particularly with regard to the drugs whose price Teva had previously raised pursuant to the Price-Hike Strategy, in direct contradiction to Olafsson's specific denials. These flat denials in answer to specific questions on the matter, in the face of contrary empirical evidence that Teva had inflated prices on 60 drugs, profited by as much as over $2.1 billion since the start of the Relevant Period, and was now suffering from drastic YOY reductions in Inflated Profit generated from those price hikes and an inability to implement more, were particularly misleading.

135.   During the same November 15, 2016 Earnings Call, a Wells Fargo analyst asked whether the stated 7% price erosion experienced that quarter was a "result of having to tame previous price increases, or give back some of those?"  Olafsson denied the existence of a pricing trend beyond that caused by Actavis-acquisition related divestitures:

> No, basically, the main reason … was that we had to divest a very good portfolio of products that had limited competition, so we had to divest it. What our customers did, as they do, is that there is a new player in the market that took over those products, and that became a pricing pressure on roughly about 60 molecules of -- and these were one of our top -- the top molecules we had in our portfolio.

So there was an instability that happened in the market during the month of August, when the new owners were taking market share. It didn't change the fundamental of the market. It didn't change the structure of the market, or the chemistry of the market, but we saw the impact on the divested molecule significantly more than we saw for on the rest of the portfolio which gave us a 7% versus 5%, which we assumed going into the quarter.

136.    The statements were false and misleading because the Inflated Profit from price hikes had declined drastically, contributing just $97 million in Q3 2016, a YOY reduction of $121 million, or 56%.  The sharp decline in Inflated Profit was a result of the materialization of the risks that the Defendants concealed as they implemented their Price-Hike Strategy, namely increased pricing pressure resulting from increased public, legislative, and regulatory scrutiny of generic drug pricing, which in turn resulted in increased competition and the inability to implement further price hikes.  Those were not single-quarter issues related to divested products, as suggested by Olafsson, but a long-term trend with no end in sight.

137.    During a December 8, 2016 Citi Global Healthcare Conference, Vigodman announced that Teva would provide 2017 guidance early in January 2017.  During the call, Vigodman claimed Teva's past success was not due to Inflated Profit from price hikes, stating:

> Since the start of 2014, one of our greatest priorities has been to increase the profitability of our generics business. In the first three years of this great effort, we have been able to improve significantly the margins of Teva's standalone generics business. This has been accomplished with a strong emphasis on the cost of goods sold, product mix, and the overall cost structure.

138.    The statement was false and misleading because, having attributed the source of the profitability increases, Vigodman had a duty to disclose but concealed that the Price-Hike Strategy, whereby Teva made at least 76 systematic price hikes since July 2013, many of which were in excess of 100% of the prior price, contributed over $2.2 billion to Teva's profit from the start of the Relevant Period through the end of 2016

139.    On February 13, 2017, Teva filed with the SEC a press release ("Q4 2016 Press

Release") reporting the Company's fourth quarter 2016 ("Q4 2016") and full year 2016 ("FY 2016") financial results, and held an investor earnings conference call (the "Feb. 13, 2017 Earnings Call"). Two days later, on February 15, 2017, Teva filed its Form 20-F for the fiscal year ended December 31, 2016 with the SEC (the "2016 20-F") reporting the Company's FY 2016 financial results (collectively, the "Q4 and FY 2016 Statements").

140.   The 2016 20-F disclosed a YOY decline in U.S. generic revenues of $200 million, or 5%. When removing the impact of Actavis' $1.168 billion in U.S. generic revenues, Teva's U.S. generic revenues from its legacy business suffered a YOY decline of $1.4 billion, or 29%. Per the 2016 20-F this decline purportedly:

> "resulted mainly from the loss of exclusivity on esomeprazole … and aripiprazole …, a decline in the sales of budesonide … due to increased competition, loss of revenues following our divestment of certain products in connection with the Actavis Generics acquisition and the decline in sales of capecitabine."

141.   The statements were false and misleading because, having attributed the source of the increased revenues, Defendants had a duty to disclose but concealed the full truth that Inflated Profit declined from as much as $848 million in 2015 to $421 million in 2016, a decline of $427 million or 50%. That YOY decline in Inflated Profit comprised 31% of the YOY decline in U.S. generic revenue from Teva's legacy business, excluding the impact of Actavis. Even giving Teva the benefit of Actavis' 2016 revenues, the YOY decline in Inflated Profit was more than double the $200 million YOY decline in U.S. generic revenues. It further concealed that the Price-Hike Strategy was unsustainable, as Inflated Profit was drastically declining, and Teva was unable to implement more hikes.

142.   Defendants concealed Teva's receipt of a subpoena from the DOJ on June 21, 2016, and a subpoena from the State AGs on July 12, 2016, each pursuant to their respective investigations into potential antitrust violations regarding pricing practices by generics

manufacturers (collectively, the "Subpoenas").

**Additional Allegations Of Scienter**

143.    Together with the above-alleged facts, the Defendants each acted with scienter in that each knew or recklessly disregarded the true facts in making the materially false and misleading statements

144.    That three of the Officer Defendants – Olafsson, Vigodman, and Desheh – resigned from Teva or had their employment with Teva terminated at a critical time, as the Company's Price-Hike Strategy was deteriorating and Teva was in regulators' crosshairs, further supports scienter.  There is a strong inference that the termination of Olafsson was connected to his fraudulent cover-up of the Price-Hike Strategy and the subsequent decline in Teva's profits as the strategy collapsed.  The explanation for his termination as "retirement" was false, and the first charges from the DOJ and State AGs regarding their pricing investigations were released only days later.  There is a similarly strong inference regarding Vigodman's termination.  He was fired without a replacement just one month after Teva significantly revised its 2017 guidance downwards, resulting in part from increased price erosion and dwindling generic profits, and one week before Teva reported disappointing financial results for Q4 2016.  Finally, less than two months after Desheh left Teva, and in the very first reporting period after all Individual Defendants were gone, Teva took a staggering $6.1 billion charge against its U.S. generics business, and announced a radical 75% reduction in dividend payments to shareholders.  This supports an inference that it was the Individual Defendants who were blocking the true financial state of the Company from coming to light.

145.    Teva's receipt of subpoenas from the DOJ and the Connecticut Attorney General on June 21, 2016 and July 12, 2016, respectively, supports a strong inference of Defendants' scienter.  Particularly, Defendants failed to disclose them in the mandatory SEC disclosures filed

in conjunction with the Notes Offering and Notes Offering materials, but then disclosed them approximately two weeks after completing the Offering.  The failure to disclose receipt of the subpoenas until the Notes Offering was completed supports scienter, as does the fact that many of Teva's competitors disclosed their receipt of a subpoena immediately, in the very next SEC disclosure.  Moreover, those subpoenas triggered a legally mandatory duty to inquire into Teva's pricing practices.  Yet, Defendants thereafter made materially false and misleading statements about their exposure to price erosion, including during Teva's September 9, 2016, Generics Day.

146.    The November 3, 2016 *Bloomberg* article revealed that Teva was the subject of the DOJ criminal inquiry, and that the DOJ and State AGs could likely bring charges later in the year.  Despite this, Vigodman, almost two weeks later, on November 15, 2016, claimed that he was "not aware of any fact that would give rise to an exposure to Teva with respect to the investigation."

147.    Teva possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above had binding authority over the Company.  In addition, certain allegations herein establish Teva's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

148.    It can be inferred that senior corporate executives at Teva possessed scienter such that their intent can be imputed to the Company.

149.    Teva engaged in a series of anticompetitive conspiracies as to particular drugs.  Plaintiffs make this allegation based on information identified in: (i) publicly filed complaints; and (ii) the State AGs allegations in their Consolidated Amended Complaint against Teva and

others ("CAC"), filed June 18, 2018; and (iii) Plaintiffs' counsel's own investigation, including review of publicly available news items.

150. The States AGs identify evidence culled from their long-running investigation, which began in 2014, including documents obtained pursuant to multiple subpoenas and cooperation by defendants who have settled with the State AGs and pled guilty to federal antitrust violations. That investigation remains ongoing. Connecticut's AG, George Jepsen, who initiated and led the State AGs' investigation, has publicly emphasized that the CAC's allegations have a strong basis in direct evidence. In an October 31, 2017 interview with CNBC, held after the States filed their proposed CAC, Jepsen emphasized that the CAC's now-expanded allegations rested on compelling evidence: "We've uncovered – through emails, text messages, and telephone patterns, plus cooperating witnesses – a very compelling case of systematic and pervasive price fixing within the industry."

151. According to the Class Complaint, Teva engaged in at least 17 sudden and aberrational price increases that show strong indicia of collusion. According to the Class Complaint, these price increases, collectively generated as much as $1.23 billion dollars in Inflated Profit for Teva.

152. In each instance, the drug's major manufacturers, including Teva, enacted large price increases at or around the same time, raising prices to exactly, or nearly exactly, the same level. For some, Teva was the first to raise prices, and others followed; other times, Teva followed another manufacturer's lead

153. The State AGs' CAC describes evidence showing Teva engaged in extensive direct communication with other manufacturers. For example, the State AGs allege that over 1,500 communications occurred between certain of Teva's "senior sales executives and other

individuals responsible for the pricing, marketing and sales of generic drugs" and employees at other manufacturers between July 1, 2013 and July 30, 2014.

154.    Teva's collusion additionally supports a strong inference of scienter.  Given all the information available to them, Defendants knew, or recklessly disregarded, that in order for the Price-Hike Strategy to generate the high level of Inflated Profits apparent in data regularly available and reported to them, Teva would likely have had to, and did, coordinate, communicate, and potentially reach illegal agreements with other manufacturers – the Antitrust Activity.  These two forms of intentional activity support scienter.

155.    The false and misleading statements regarding the source of Teva's profits as described in its SEC disclosures identified above, and the false and misleading statements regarding competition in Teva's SEC disclosures as identified above, were false and misleading, in addition to the reasons enumerated above, because Teva conspired with other manufacturers to fix prices for certain generic drugs.  Statements regarding the supposed source of Teva's revenues were false because they omitted the fact that Teva's revenues were partly generated by collusive means.

156.    Statements describing the supposed competitiveness of the U.S. generic drug market were false because Teva was in reality participating in series of anticompetitive conspiracies that distorted competitiveness.

## LOSS CAUSATION

157.    In addition to the allegations herein, Defendants' fraudulent conduct directly and proximately caused Plaintiffs to suffer substantial losses as a result of purchasing Teva Securities at artificially inflated prices during the Relevant Period.

158.    Beginning in August 2016, the concealed risks began to materialize through a

series of negative events and disclosures that revealed, on a piecemeal basis, the false and misleading nature of the Defendants' Relevant Period statements and omissions. Despite these partially corrective events and disclosures, Teva Securities' prices remained artificially inflated and were prevented from declining to their true value by Defendants continuing to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud. As the relevant truth leaked out into the market from August 2016 to August 2017, Plaintiffs suffered losses, which were foreseeable and caused by the materialization of the risks that Defendants' fraudulent conduct concealed from investors, as set forth below.

159. After the close of trading on August 4, 2016, Teva filed its Q2 2016 6-K, reporting 2Q 2016 results, which announced (i) poor generics segment earnings, including a $115 million YOY decline in profits for the generics segment; and (ii) that "[o]n June 21, 2015 [sic], Teva USA received a subpoena from the Antitrust Division of the United States Department of Justice seeking documents and other information relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products" and "[o]n July 12, 2016, Teva USA received a subpoena from the Connecticut Attorney General seeking documents and other information relating to potential state antitrust law violations."

160. On this news, the prices of Teva Securities declined.

161. On November 3, 2016, during the trading day on the NYSE, *Bloomberg* published an article titled "U.S. Charges in Generic-Drug Probe to Be Filed by Year End," describing the DOJ's "sweeping" two-year investigation related to the soaring prices of generic drugs and how executives from more than a dozen generic pharmaceutical manufacturers, including Teva, were suspected of colluding to raise the prices of generic drugs. The article broke the news that the

43

first criminal charges against executives of those companies could emerge by the end of the year, and that State AGs were seeking to bring claims against generic manufacturers.

162.    On this news, the prices of Teva Securities declined once again.

163.    In a November 3, 2016 article titled "News of Charges in Price-Fixing Inquiry Sends Pharmaceuticals Tumbling," *The New York Times* reported that the news that the DOJ and State AGs' investigations found serious evidence of criminal conduct caused significant declines in the price of Teva Securities.  On November 4, 2016, S&P Capital IQ lowered its rating of Teva ADS from "buy" to "hold" and its 12-month price target by $34 to $50 per share, noting that "[w]e think this could pose yet another challenge to an industry that has been hit hard by charges of high drug prices and will be an overhang on the shares."  HSBC in its November 4, 2016 analyst report, downgraded Teva from "buy" to "hold" and lowered its price target from $66 per share to $44 per share, noting "US DOJ investigation into alleged US generic drug price collusion creates significant uncertainty" for Teva and for investors.  In a November 10, 2016 article titled "DOJ's price-fixing investigation could lead to sizable liabilities, analyst says," *Fierce Pharma* reported that analysts tracking the generic drug industry believed that liability from the investigations could have a sizeable financial impact on Teva, estimated at $700 million.

164.    Within weeks the expected governmental actions materialized.  On December 13, 2016, the DOJ, charged two executives with two felony counts of violating Section 1 of the Sherman Act partly for fixing the price of Glyburide, a drug for which Teva held 75% of the market.

165.    On December 14, 2016, led by the Connecticut AG, the State AGs filed their lawsuit against Teva and several of its peers for civil violations of the antitrust laws, accusing

Teva of conspiring to allocate the markets for and fix the prices of generic drugs, including for Glyburide, and of participating in a larger market-wide collusive conspiracy. *Forbes* reported the next day, in an article titled "State Attorneys General Accuse Six Generic Companies Of Fixing Drug Prices," that the AG's complaint revealed new information regarding Teva's potential exposure, made "clear which companies could be implicated in the antitrust investigation federal prosecutors are pursuing[.]"

166. On the news of the DOJ charges and the filing of the State AGs' complaint, the prices of Teva Securities continued to decline.

167. On November 15, 2016, before trading opened on the NYSE, Teva filed a press release with the SEC reporting its Q3 2016 financial results, which were well below consensus expectations largely due to poor sales in Teva's generics divisions, including a $277 million YOY decline in revenue in Teva's "legacy" U.S. generics segment (*i.e.*, in the pre-Actavis-transaction portion of Teva's U.S. generics business). In the Company's November 15, 2016 earnings call, the Company also revised downward its 2016 guidance, and disclosed for the first time that the rate of price erosion for its generic drugs has increased from 5% to 7%, although Olafsson falsely claimed that the increase was the result of divestitures from the Actavis transaction, and thus was limited to one quarter.

168. On this news, the prices of Teva Securities continued to decline.

169. Analysts responded negatively to the new information concerning the Company's disappointing financial results. That day, in a report titled, "Are The Wheels Coming Off? Sure Feels That Way," PiperJaffray lowered its price target from $57 per share to $43 per share, noting that "it appears to us that Teva painted an overly sanguine picture of its generics business at its investor event in September [during the Generics Day]," and describing Q3 2016 as a

"credibility-damaging quarter," because, in the face of Olafsson's explanation that the price erosion would be limited, it was "difficult for us to take that assertion at face value." Also that day, Deutsche Bank wrote "TEVA reported 3Q revenue that was below our estimate on lower generic sales … the company saw higher than expected price erosion in 3Q …" and, as a result, lowered its price target for the Company from $68 per share to $54 per share on "lower growth assumptions for generics." Likewise, in a November 16, 2016 report, Morgan Stanley lowered its price target for the Company from $63 per share to $42 per share, as a result of the lower than expected generics growth and worse than expected price erosion.

170. After the close of trading on December 5, 2016, Teva filed a Form 6-K announcing that Olafsson would be stepping down as President and CEO of the Company's Global Generic Medicines Group and that, effective immediately, he would be replaced by Bhattacharjee. Teva offered no explanation for Olafsson's departure, instead claiming he was "retiring" even though he was only in his late 40s and quickly obtained other employment.

171. On this news, on December 6, 2016, the prices of Teva Securities continued to decline.

172. Analysts tied Olafsson's termination to the disappointing results in Teva's generics segment and concerns over pricing pressure. On December 6, Morningstar reported: "Teva's announcement [that it] will replace Siggi Olafsson as CEO of the generics segment does not inspire confidence. ***Recent pricing pressure*** in the generic drug market … remain[s] significant near-term challenge[] for Teva, which makes the abrupt leadership change a ***concerning development at a critical time*** for the company." A December 5 BTIG report noted "[w]ithout Siggi Olafsson at the helm of Teva's global generic segment, we think investor sentiment could worsen as the market has remained ***focused on price erosion for the***

*[company's] base generic business*" and that "the departure of Mr. Olaffson [sic] creates more uncertainty as we head into 2017."

173.    On January 6, 2017, before the beginning of the trading day on the NYSE, Teva filed a press release on Form 6-K announcing a significant reduction in the 2017 guidance previously released on July 13, 2016.  In the investor conference call that day, Vigodman claimed the "significantly" reduced guidance resulted from "significant headwinds" faced by "[t]he entire healthcare sector" to which Teva "ha[d] not been immune," and "some issues specific to Teva" resulting in "an EBITDA gap of $1.2 billion emanating from our US generics business."  In addition to the materialization of the concealed risks described herein, this was the materialization of the risk of Defendants using an "assumption" for price erosion in the July 13, 2016 guidance that was empirically false at the time; specifically, Defendants assumed a pricing environment that was "stable"— *i.e.*, 4%-5% erosion rate disclosed in prior years and quarters— when, in fact, pricing pressure was causing a more rapid decline.

174.    As a result of this new negative information, the prices of Teva Securities continued to decline.

175.    Analysts tied this disclosure to the fact that the prior guidance was "inflated" as a result of understating generic drug price erosion.  In a report dated January 6, 2017, Evercore ISI conducted its own price erosion analysis for the Company and noted that, as a result of its lower than expected revenues and EPS, "I think it's *pretty clear that mgmt's prior expectation for 2017 were very inflated*."  Similarly, the same day, Maxim Group downgraded its rating of the Company from "buy" to "hold" and its price target for the Company from $49 per share to $41 per share and noted "challenges in the near term to the core generic ... business are becoming bigger issues."  In a January 8, 2017 report, Piper Jaffray stated that "Teva once again provided

disappointing guidance, further eroding what in our view was already *limited management credibility*."

176.    On February 6, 2017, after the close of trading on the NYSE, in a Form 6-K filed with the SEC, Teva announced the termination of Vigodman as CEO, effective immediately and without a permanent replacement, and the conclusion of his service on the Board of Directors.

177.    On this news, the prices of Teva Securities continued to decline.

178.    Analysts tied Vigodman's abrupt departure to the Company's poor financial performance in its generics business since no later than Q2 2016, as well as sustained difficulties for the generics business ahead.  For example, in a February 6, 2017 report titled "CEO Transition Adds Further Uncertainty to Story," J.P Morgan reported "we view today's update as a disappointment, with arguably the two most important executives at Teva stepping down (Erez and Siggi Olafsson, CEO of generics) within the last several months at a time of significant fundamental challenges.  With Teva facing headwinds across both its generics (incremental competition, pricing headwinds) and branded business … we continue to believe a near-term recovery in the company's business is unlikely."  Similarly, that day, Wells Fargo concluded that "more investors will be uneasy with the uncertainty of an unexpected and abrupt CEO departure."

179.    On August 3, 2017, before the NYSE opened, Teva filed a press release on a Form 6-K announcing lower-than-expected Q2 2017 financial results. The Company (i) attributed its poor financial results to poor performance in its U.S. generics business (with reported profits of only $691 million, far below analyst expectations) and "accelerated price erosion"; (ii) was required to take a $6.1 billion accounting charge permanently writing-down the value of the generics business; and (iii) imposed a 75% reduction in the Company's long-

standing dividend.   The Company also significantly lowered its guidance for 2017, revising downward its earlier-reported guidance from January 2017 for the Company's net revenues, operating income, EBITDA, EPS, and cash flow.   On the Company's earnings conference call held that day, McClennan, Teva's interim CFO, explained that the poor results and reduced guidance were partly the result of increased price erosion and price pressure.   Importantly, Bhattacharjee further noted the "impact of the shelf stock adjustments that [Teva has] done," as a "key element" of the revised outlook.   Shelf stock adjustments are contractual provisions that require charge backs to customers when prices decline.   It was highly foreseeable that prices would decline on at least the 60 drugs subject to the Price-Hike Strategy, drugs for which Teva had increased price by at least 50%, and as much as 1543% over the Relevant Period.   Teva's $6.1 billion permanent impairment charge directly reduced Teva's bottom line dollar-for-dollar.

180.   Analysts reacted harshly.   That day, J.P. Morgan wrote, "Teva reported weaker-than-expected results but more importantly lowered in 2017 sales and EPS guidance … and cut its dividend by 75%.…   U.S. *generic weakness appears to be at the heart of these reductions*." Jefferies wrote, "Mgt Had Effectively No Choice but to Cut the Dividend; Maintaining Debt Covenants a Key Concern."   Oppenheimer noted, "it may be difficult for Teva's board to attract top talent (meaningful pharma CEO experience) given the company's ongoing challenges," as the CEO and CFO positions remained unfilled.   Analysts were further concerned about Teva's ability to sustain its debt and debt rating.   Jefferies wrote: "Can It Get Any Worse?," noting that "[a]t present, Teva has a debt covenant that requires a minimum leverage of 4.25 x (net debt/EBITDA) by YE17 …   If mgt's ever-shrinking EBITDA guidance … erodes much further, *it is possible Teva may not meet the [debt] obligation*."   The reality was that Teva's poor results, guidance reduction, and the risk that it could not satisfy its debt obligations were the

materialization of the risks associated with the Price-Hike Strategy and its ultimate demise.

181.    There was no realistic prospect that the strategy could be revived, or that it could again generate the same Inflated Profits.  The result was the write down of the generics business by $6.1 billion, and Teva cutting its dividend by 75%.

182.    With the true financial condition of the Company more evident, credit rating agencies immediately issued rating downgrades.  On August 3, 2017, Moody's downgraded Teva's debt rating to Baa3 (one step above "junk"), with a negative outlook, reflecting slower-than-anticipated deleveraging "as Teva contends with weakness in its US generics business." Likewise, on August 4, Fitch Ratings also downgraded Teva to BBB- (one step above "junk"), with a negative outlook

183.    As investors digested the news, the prices of Teva Securities dropped.

184.    **Leakage**.  During the period of August 2016 to August 2017, including but not limited to the dates noted herein, information about Teva's Antitrust Activity and Price Hike Strategy leaked into the market.  On no single day did Teva fully disclose the truth of its Antitrust Activity and Price Hike Strategy; nor did the market learn about Teva's Antitrust Activity and Price Hike Strategy on one single day.  As the information entered the market, the price of Teva securities declined.

185.    **Materialization of the risk**. Each of the disclosures noted above materialized the concealed risk of Teva's Antitrust Activity and hidden Price Hike Strategy.

## RELIANCE

186.    Plaintiffs, through their investment manager, actually, read (or heard), reviewed, and relied upon Defendants' misrepresentations prior to purchasing Teva Securities.

187.    In particular, employees of Plaintiffs' Investment Manager read Teva's SEC

filings.

188.     When purchasing Teva securities on behalf of Plaintiffs, the Investment Manager actually read (or heard) and justifiably relied on the statements contained in public filings described above.

189.     Had the Investment Manager known the truth, it would not have purchased Teva securities on behalf of Plaintiffs or, if it had done so, would not have paid the price it did.

190.     As to Teva ADSs, and for derivatives connected to Teva ADSs, Plaintiffs also invoke the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Teva's ADSs traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Teva; and (e) Plaintiffs purchased Teva Securities between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

191.     The market for Teva Securities was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Teva Securities traded at artificially inflated prices during the relevant period. The artificial inflation continued until the time the market came to realize the truth about Teva.

192.     At all relevant times, the market for Teva Securities was efficient for the following reasons, among others:  (a) Teva filed periodic reports with the SEC; (b) the ADSs were listed and actively traded on a major national exchange; (c) numerous analysts followed

Teva; (d) the average weekly trading volume of Teva shares exceeded 2% of its total outstanding shares; and (f) Teva regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

193. Plaintiffs purchased Teva Securities in reliance on the market price of Teva ADSs, which reflected all the information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

194. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Teva who knew that those statements were false when made.

## FIRST CAUSE OF ACTION
### Violations of Section 18 of the Exchange Act
### Against All Defendants

195.    Plaintiffs repeat and reallege each and every allegation above as if set forth herein.

196.    As alleged herein, Defendants at least negligently made or caused statements to be made in Teva's SEC filings, including 20-F filings, including statements concerning Teva's competitiveness, profits, source of profits, and controls, which statements were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, or omitted material facts whose omission rendered those statements false and misleading when made.

197.    In purchasing Teva Securities, Plaintiffs' investment team actually read, and had direct eyeball reliance on, Teva's SEC filings (to the extent each such document was on file with the SEC at the time).

198.    In ignorance of the falsity of Defendants statements and omissions, or of the true facts, Plaintiffs purchased Teva Securities in actual, eyeball reliance upon Defendants' representations.

199.    Defendants' materially false and misleading statements and omissions of material fact artificially inflated (or depressed, as the case may be) the price of Teva Securities.

200.    Had they known the true facts, Plaintiffs would not have purchased Teva Securities and/or would not have purchased them at the inflated prices they paid.

201.    Upon disclosure of the true facts, the prices of Teva Securities dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

202.    By reason of the foregoing, Defendants are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r.  Taking into account, *inter alia*, tolling of the limitations period by the filing of class action complaints against Teva, Plaintiffs have brought this claim within the statute of limitations.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

203.    Plaintiffs repeat each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

204.    This Cause of Action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

205.    Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price (or value) of Teva ADSs; and (iii) cause Plaintiffs to purchase Teva Securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth above.

206.    Defendants both directly and indirectly: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Teva Securities in an effort to artificially inflate and maintain the market prices (or value) for Teva Securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

207.    By virtue of their high-level positions at the Company, the Individuals Defendants were authorized to make public statements, and made public statements on Teva's behalf. These senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

208.    In addition, Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to Teva's profits, competitiveness, Antitrust Activity, profit sources, and controls, so that the market price (or value) of the Company's securities would be based on truthful, complete and accurate information.

209.    Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them. Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Teva's operations, business, performance and prospects from the investing public.  By concealing these material facts from investors, Defendants supported the artificially inflated price of Teva's securities.

210.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price (or value) of Teva's Securities. In ignorance of the fact that the market prices (or value) were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Teva, and upon the integrity of the market in which the Company's securities trade, or

upon the absence of material adverse information that was recklessly disregarded by Defendants but not disclosed in public statements by Defendants, Plaintiffs purchased Teva Securities at artificially inflated prices. As a series of partial but inadequate disclosures were issued, the price of Teva's Securities substantially declined.

211. At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed Defendants' statements to be true. Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Teva, which was concealed by Defendants, Plaintiffs would not have purchased Teva Securities, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

212. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

213. Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Teva Securities. Plaintiffs would not have purchased Teva stock at the prices they paid, or at all, if they had been aware that the market prices (or values) had been artificially and falsely inflated by Defendants' misleading statements.

214. Taking into account, *inter alia*, tolling of the limitations period by the filing of class action complaints against Teva, Plaintiffs have brought this claim within the statute of limitations and the applicable statute of repose. Consequently, this action is timely.

### THIRD CAUSE OF ACTION
#### Violations of Section 20(a) of the Exchange Act
#### Against the Individual Defendants

215. Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

216. This Cause of Action is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

217. Each of the Individual Defendants was at the time of the wrongs alleged herein a controlling person of Teva within the meaning of Section 20(a) of the Exchange Act.

218. By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

219. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

220. By reason of the conduct alleged in the First Cause of Action, Teva is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and the Individual Defendants are liable pursuant to Section 20(a) based on their control of Teva.

221. The Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Teva securities.

222. Taking into account, *inter alia*, tolling of the limitations period by the filing of class action complaints against Teva, Plaintiffs have brought this claim within the statute of limitations and the applicable statute of repose. Consequently, this action is timely.

**FOURTH CAUSE OF ACTION**
**Common Law Fraud Against All Defendants**

223.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

224.    Defendants made, authorized or caused the representations and/or omissions set forth above.

225.    Those representations and omissions were material.

226.    The material representations set forth above were knowingly made by such Defendants with the intent to deceive, and such Defendants' representations omitted and concealed material statements of fact from Plaintiffs.

227.    Each such Defendant knew its representations were false and/or misleading, and their omissions were material and rendered their representations misleading, at the time they were made or omitted.

228.    Defendants knew that Plaintiffs would receive and rely on such representations, and intended that their false and/or misleading statements would induce Plaintiffs to purchase Teva securities at inflated prices.

229.    Plaintiffs reasonably and justifiably relied on such misrepresentations and omissions. Plaintiffs would not have purchased Teva securities at all, or at the prices they paid, had they known the truth.

230.    As a direct and proximate result of such reliance, and these Defendants' fraudulent misconduct, Plaintiffs have suffered damages.

231.    Plaintiffs did not, and could not, have discovered Defendants' acts of fraud unless and until the truth was revealed via a series of disclosures.

### FIFTH CAUSE OF ACTION
### Negligent Misrepresentation Against All Defendants

232.    Plaintiffs repeat and reallege each and every allegation as if set forth herein.

233.     Defendants authorized or caused the representations and/or omissions set forth above.

234.     Defendants supplied false information for use by Plaintiffs in making investment decisions.

235.     Defendants had no reasonable grounds for believing the representations were true when made.

236.     Defendants had a duty to exercise reasonable care and competence in providing information about Teva to Plaintiffs.

237.     Defendants made misrepresentations that they knew, or should have known, to be false in order to induce investors, including Plaintiffs, to purchase Teva securities.

238.     Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

239.     Plaintiffs reasonably and justifiably relied on such misrepresentations. Plaintiffs would not have purchased Teva securities at all, or at the prices they paid, had they known the truth.

240.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding Plaintiffs punitive damages;

59

(c)     Awarding Plaintiffs their attorneys' fees and costs; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: February 8, 2019

Respectfully submitted,

Churchill H. Huston
**CHURCHILL HUSTON LAW, LLC**
2401 Pennsylvania Avenue
Suite 1-A5
Philadelphia, PA 19130
Tel: 215-845-5960
Fax: 215-839-1099
chh@nursinghomeneglectpa.com

Lawrence M. Rolnick (*pro hac vice to be filed*)
Marc B. Kramer (*pro hac vice to be filed*)
Richard A. Bodnar (*pro hac vice to be filed*)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: 212-262-6700
Fax: 973-597-2381
lrolnick@lowenstein.com
mkramer@lowenstein.com
rbodnar@lowenstein.com

&

Thomas E. Redburn, Jr. (*pro hac vice to be filed*)
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07068
Telephone: 212-262-6700
Fax: 973-597-2381
tredburn@lowenstein.com

*Counsel for Plaintiffs*

60